UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**SHARON THOMAS**,                                  Case Number 1:13 CV 1177

Plaintiff,                                          Judge Donald C. Nugent

v.                                                  REPORT AND RECOMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

Defendant.                                          Magistrate Judge James R. Knepp, II

### INTRODUCTION

Plaintiff Sharon Thomas seeks judicial review of Defendant Commissioner of Social Security's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2 (b)(1). (Non-document entry dated May 28, 2013). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

### PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on March 24, 2011, claiming she was unable to work due to depression, anxiety, disc disease, foot pain, and sarcoidosia. (Tr. 22, 231, 237, 269). Her claims were denied initially and on reconsideration. (Tr. 167, 176, 184, 191). At Plaintiff's request, a hearing was held before an administrative law judge ("ALJ"). (Tr. 74). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 19, 41). The Appeals Council denied Plaintiff's

request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. On April 19, 2013, Plaintiff filed the instant case. (Doc. 1).

Prior to the instant case, Plaintiff filed DIB and SSI applications on December 16, 2008, and alleged a disability onset date of November 11, 2008. (Tr. 22). On March 7, 2011, an ALJ found Plaintiff was not disabled and restricted her to a range of light work. (Tr. 22, 82, 89). This prior ALJ decision (Tr. 82), which was recently affirmed in federal court (ECF No. 1:12-cv-279), is relevant because the ALJ in the instant case followed the *Drummond* ruling, which is a Sixth Circuit *res judicata* rule requiring an ALJ to adopt the residual functioning capacity ("RFC") finding in a prior decision absent a change of circumstance shown by new or material evidence. (Tr. 22); *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 842 (6th Cir. 1997); *see also* Acquiescence Ruling 98-4(6).

## FACTUAL BACKGROUND

### *Plaintiff's Vocational and Personal Background*

Plaintiff was 43 years old at the time of her alleged disability onset date of November 15, 2008. (Tr. 22, 33). She has a tenth grade education and prior relevant work experience as a mail sorter and home childcare provider. (Tr. 33, 457).

The ALJ's discussion of Plaintiff's medical history, hearing testimony, and background is an accurate and thorough reflection of the record and is fully incorporated herein. (Tr. 26-32).

> The claimant attends to her personal care; her adult daughters do the cleaning and shopping but the claimant is able to drive and manage her finances (Ex. B5E). The claimant lives with her two adult daughters and "she stays to herself." She gets along with authority figures and has never been fired or laid off from a job because of problems getting along with other people (testimony and Ex. B5E). Her psychiatrist notes that her cognition is intact (Exs. B5F, p. 12-13, B14F, p. 5-6 and 9-10, and B22F). The claimant was psychiatrically hospitalized briefly on two occasions; neither stay was of an "extended duration."

> * * *

The claimant stated that depression, anxiety, disc disease, foot pain, and sarcoidosis limit her ability to work and she stopped working on November 11, 2008 due to her conditions (Ex. B3E, p. 2). In a subsequent Disability Report, the claimant stated that she has fibromyalgia, chronic pain, fatigue, memory problems, and carpal tunnel syndrome (Ex. 10E, p.2). The claimant testified that mental and physical problems keep her from working. She has depression and "breakdowns" described as periods of crying. She feels down and cries when she feels stressed. She does not associate with others. She has pain in her whole body though the pain is worse in her back, hands, and feet. The pain in her back is "sharp" and lasts all day; her hands ache all day, every day; and her feet ache. She experiences shortness of breath. The claimant further testifies that she can walk five steps but then needs to stop; she gets weak when she stands; she can sit for 30 minutes; and she cannot lift over 10 pounds. Her daughters do "everything" including help with her personal care.

* * *

In terms of the claimant's alleged physical limitations and symptoms including pain, a review of the evidence of record shows that Susan Flores, M.D., the claimant's primary care physician, saw the claimant on March 7, 2011. The claimant asked for a pregnancy test and had a boil under her left breast that was painful (Ex. B3F, p. 5).

On March 11, 2011, the claimant went to East Cleveland Health Care with a cough and sinus congestion. She was "well appearing" and the physical examination was unremarkable including the examination of her back, neck, and extremities; and her gait was within normal limits (Ex. B2F, p. 5-6). Later in March 2011, Dr. Flores prescribed Cipro, Mucinex, Tylenol as needed, and Valium as needed for anxiety (Ex. B3F, p.4).

On June 9, 2011, the claimant saw Kingman Strohl, M.D., of the Respiratory Diagnostic Center. The claimant complained of shortness of breath and difficulty with exercise and walking. The claimant had skin eruptions on her back and thigh that was previously diagnosed as a sarcoid rash. Dr. Strohl thought the claimant was having a sarcoid flare and increased her Prednisone to 20 mg every other day alternating with 10 mg for five weeks. He asked her to return in five weeks and thought she may do cardiopulmonary testing to explain her dyspnea. He noted that her last lung functions were generally good (Ex. B8F, p. 4-5).

On June 16, 2011, Elizabeth Brooks, M.D., of the Rheumatology Clinic at University Hospitals, evaluated the claimant's joint pain involving her wrists, feet, and lower back. The claimant's current medications included Advair 250/50, Clonazepam, ProAir as needed, Triamcinolone topical, Cerovite, Prednisone every other day, Cetirizine, Cymbalta, Temazepam, Diazepam as needed, Trazodone, Nasonex, and Pristiq. On physical examination, the neck was supple

with full range of motion and no adenopathy; the lungs were clear to auscultation bilaterally; the cardiac exam showed regular rate and rhythm, normal S1, S2 without murmur, rub, or gallop; there was a rash over the back that was erythematosus; the extremities were without clubbing, cyanosis, or edema; the musculoskeletal exam showed painful range of motion in both wrists with a positive Phalen's and Tinel's at the wrists bilaterally and there was painful range of motion in the shoulders bilaterally; there was preserved range of motion in all other joints without erythema, warmth, or swelling to suggest active synovitis; there were 14/18 fibromyalgia tender points in the classic distribution; the spine and sacroiliac joints were nontender to palpation; the neurologic exam showed intact cranial nerves II-XII; motor strength was 5/5 throughout; sensation was intact to light touch; and reflexes 2+ upper and lower extremities bilaterally with down-going toes (Ex. B6F, p. 3-4).

X-rays of both hands and wrists showed trace degenerative joint disease in the first carpometacarpal joint bilaterally; there was no evidence of erosion, periosteal reaction, fraction, or dislocation; and there was very slight spur formation in the first carpometacarpal joint bilaterally. X-rays of the right foot showed slight joint space narrowing and spur formation of the first MTP joint; and tiny posterior calcaneal spur; no periosteal reaction or erosion; and no acute fraction or dislocation. X-rays of the left foot showed an old fracture deformity of the fifth proximal phalanx; slight stable joint space narrowing and spur formation of the first MTP joint; tiny plantar and posterior calcaneal spurs; no erosions or periosteal reaction; and no acute fracture or dislocation (Ex. B6F, p.4 and 9-12).

Dr. Brooks concluded that the claimant had a history of cavitary sarcoidosis as well as depression and a physical examination suggesting carpal tunnel syndrome at the wrists bilaterally; multiple fibromyalgia tender points which she did not know whether that was the sole cause of the claimant's joint symptoms or whether the claimant could have an underlying sarcoid arthropathy, or simply early degenerative joint disease; and the claimant was very concerned about her skin involvement but had never tried Hydroxychloroquine. Dr. Brooks recommended laboratory studies drawn and as long as the claimant's G6PD was normal, she would be given a trial of Hydroxychloroquine (Plaquenil); physical therapy and occupational therapy as well as a prescription for bilateral resting wrist splints for night-time use; and the claimant was asked to return for follow-up in four weeks and to call in the interim if she noted any specific joint swelling so that she could be seen sooner (Ex. B6F, p. 4-5).

The prescription from Dr. Brooks referred the claimant to six to eight weeks of physical therapy/occupational therapy for evaluation and treatment (Ex. B9F, p. 3).

On August 18, 2011, the claimant returned to see Dr. Brooks. The claimant stated that aquatherapy was not helping and she complained of "pain all over." Working diagnoses were sarcoidosis and fibromyalgia with 14 of 18 tender points. The

claimant was well appearing; had normal strength; and had joint pain and stiffness but no warmth, redness, or swelling. Dr. Brooks prescribed Gabapentin; told the claimant to continue physical therapy; and advised the claimant to exercise daily (Ex. B17F, p. 11-12).

On September 16, 2011, the claimant saw Dr. Flores simply for re-fills and a flu shot (Ex. B13F, p.2).

On December 8, 2011, the claimant reported to Dr. Brooks that her greatest pain was in her hands/wrist, low back, and feet. In response, Dr. Brooks increased the Gabapentin dose and ordered an EMG to exclude carpal tunnel syndrome (Ex. B17F, p. 6-7).

The claimant followed-up with Dr. Strohl on December 15, 2011. The claimant was medically stable though Dr. Strohl was concerned about the claimant from a psychological point of view because she was tearful and the holidays were a difficult time of year for her. The claimant had not seen her psychiatrist since September 2011 (Ex. B11F, p. 3-4).

On February 28, 2012, Dr. Brooks noted that the claimant was still symptomatic but overall better on Plaquenil and Gabapentin. She had a Vitamin D deficiency so Dr. Brooks prescribed Vitamin D. The EMG results were normal. The claimant's current medications also included Abilify, Cymbalta, Hydrocortisone cream, and Caltrate (Ex. B17F, p. 1-2).

The claimant was discharged from physical therapy on January 11, 2012. The therapist noted that the claimant was finally doing better using orthotics in her shoes and doing home exercises regularly, but the claimant failed to attend the final visit to review and finalize her home exercise program (Ex. B18F, p. 1).

On January 19, 2012, the claimant saw Dr. Strohl. The claimant was chatty and interacting much better than on her last visit. She was doing fairly well from a sarcoid point of view and mood point of view. The physical examination was unremarkable. The claimant stated that she could not walk very far but the doctor noted that her lung function was normal and her "6-minute walk" was within normal limits (Ex. B19F, p.5).

* * *

The claimant alleges constant, unrelenting pain, shortness of breath, lying in bed all day, constant crying, needing help to get dressed, etc. She alleges that she can only walk five steps at a time. She alleges that everything is wrong with her. The undersigned finds her allegations not credible. Dr. Brooks regularly advised the claimant to exercise daily (Ex. B17F, p. 2, 4, 9, and 12). Certainly if the claimant's allegations were true, Dr. Brooks would not simply advise the claimant to exercise daily. On June 30, 2011, the claimant told the physical therapist that

she "does nothing" but the physical therapist noted that by casual observation of the claimant's movement, it did not reveal evidence of pain or limitation (Ex. B18F, p. 4).

As for the opinion evidence regarding the claimant's physical impairments, two State agency medical consultants reviewed the claimant's case file at the request of the State agency, the Division of Disability Determination Services. The assessments provided by both medical doctors are consistent with the previous ALJ decision (Exs. B2A, B3A, B6A, and B7A).

On December 19, 2011 and March 29, 2012, Dr. Strohl completed "Medical Source Statement: Patient's Physical Capacity" forms for the claimant (Exs. B11F and B15F). For several reasons, the undersigned rejects the assessments to the extent that they differ from the residual functional capacity in the previous ALJ decision. On December 15, 2011, Dr. Strohl stated that the claimant was "stable from a medical point of view" (Ex. B11F, p.4). The claimant told Dr. Strohl that she had carpal tunnel syndrome and even though he did not see the diagnosis in her record, he attributed some of her limitations to carpal tunnel syndrome (Ex. B11F, p. 1-3). The claimant stated that she could not walk very far but Dr. Strohl noted that her lung function was normal and her "6-minute walk" was within normal limits (Ex. B19F, p. 5) though on the forms he notes that her ability to walk and stand are affected. It appears that Dr. Strohl had relied on statements made by the claimant as opposed to using his professional opinion in completion of these forms. The treatment notes simply do not support the assessments.

In terms of the claimant's alleged mental limitations, on April 7, 2011, the police took the claimant to the Emergency Room at Huron Hospital for depression and suicidal thoughts with a severity level of moderate. She had not been compliant with her psychotropic medication. The claimant could not identify one stressor, stating that it was "everything." The claimant later stated that she was not suicidal; and that she had been awake for what felt like a long time and she just wanted to sleep (Ex. B4F, p. 3-9).

After her discharge from Huron Hospital, the claimant saw Deborah Gould, M.D., her treating psychiatrist, on April 11, 2011. The claimant had been denied disability, became more depressed, and had been admitted to Huron Hospital for three days. The claimant was still depressed secondary to her finances. The mental status examination showed the claimant to be well groomed; her thoughts were organized; she was not delusional; her affect was constructed and her mood was dysphoric; there were no suicidal ideation; she was cooperative; her cognition was intact; and her judgment and insight were decreased. The claimant's current psychotropic medications included Pristiq, Ativan, Klonopin, and Restoril. Dr. Gould recommended counseling for the claimant (Ex. B5F, p. 12-13). As of June 2011, the claimant continued to feel depressed about the denial (Ex. B7F, p. 15-16). As of August 1, 2011, the claimant was "stable." Her affect was brighter and she related her depression to her current medical issues. Her current psychotropic

medications included Cymbalta, Ativan, Klonopin, and Trazodone (Ex. B14F, p. 12).

On September 12, 2011, the mental status examination showed the claimant to be well groomed; her thoughts were organized; she was not delusional; her affect was constricted and her mood was dysphoric; there was no suicidal ideation; she was cooperative; her cognition was intact; and her judgment and insight were fair. She continued to be depressed dealing with multiple medical issues (Ex. 14F, p. 9-10).

The claimant did not return to see Dr. Gould again until December 28, 2011. The claimant reported to have two weeks of worsening depression and suicidal ideation and neurovegatative symptoms. Her affect was constricted and her mood was dysphoric; she had suicidal ideation with plan to overdose; psychomotor retardation; and decreased insight and judgment. Dr. Gould performed a risk assessment and "pink slipped" the claimant to South Pointe (Ex. B14F, p. 7-8). On December 28, 2011, the claimant was hospitalized for suicidal ideation. She responded well to medication and was discharged on December 30, 2011, and given an appointment to see Dr. Gould on January 6, 2012 (Ex. B12F).

On January 6, 2012, the mental status examination showed the claimant to be well groomed; her thoughts were organized; she was not delusional; her affect was constricted and her mood was dysphoric; there was no suicidal ideation; she was cooperative; her cognition was intact; and her judgment and insight were improving. The claimant was still depressed due to medical and financial problems. Her current medications included Cymbalta, Ativan, Valium, Trazodone, Gabapentin, and Hydroxychloroquine (Ex. B14F, p. 5-6). The mental status examination on April 30, 2012 remained the same except the claimant's judgment and insight were fair. Her current psychotropic medications included Abilify, Cymbalta, Valium, and Trazodone (Ex. B22F).

* * *

As for the opinion evidence regarding the claimant's mental impairments, two State agency medical consultants reviewed the claimant's case file at the request of the State agency, the Division of Disability Determination Services. The assessments provided by both psychologists are consistent with the previous ALJ decision (Exs. B2A, B3A, B6A, and B7A).

On March 30, 2011, Dr. Gould completed a "Medical Source Statement: Patient's Mental Capacity" form for the claimant (B16F). Of the 21 activities to rate, Dr. Gould rated the claimant's ability as "poor" (defined as a "ability to function is significantly limited") in 12 of the activities including the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Ex. B16F). The undersigned gives little weight to Dr.

Gould's assessment because it is not supported by the mental status examinations or the record as a whole (see Exhibit B14F, p.1).

The claimant is not credible. In May 2011, the claimant stated that she felt that counseling would be beneficial (Ex. B7F, p. 17-18) but the undersigned sees no evidence that the claimant saw a counselor. From this, the undersigned concludes that the claimant's symptoms are not as severe as alleged.

The record does not establish that the claimant's use of prescribed medication is accompanied by side effects that would interfere significantly with her ability to perform work within the restrictions outlined in this decision.

(Tr. 26-32).

### *VE Testimony and ALJ Decision*

On June 1, 2012, the ALJ determined Plaintiff suffered from severe impairments including sarcoidosis, depressive disorder, panic disorder, degenerative disc disease of the cervical spine, and osteoarthritis of the left foot and right hip. (Tr. 25, 35). The ALJ found these impairments did not meet or medically equal a listed impairment. (Tr. 25).

Next, adopting the previous ALJ's finding, the ALJ determined Plaintiff had the RFC to perform a range of light work, except she can frequently push and pull bilaterally; can frequently operate foot controls bilaterally; can occasionally climb ramps and stairs; can never climb ladders, ropes or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; must avoid repetitive rotation, flexion, and extension of the neck; must avoid concentrated exposure to extreme heat, extreme cold, humidity, excessive vibration hazardous moving machinery, and unprotected heights; and is limited to performing simple, routine tasks in a low stress environment without strict production quotas and involving occasional interaction with the public, coworkers, and supervisors. (Tr. 27).

Based on VE testimony, the ALJ determined Plaintiff could perform work as a wire worker, electronics worker, and bench hand, and was therefore, not disabled. (Tr. 34).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five–step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially

limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can she perform past relevant work?

5. Can the claimant do any other work considering her RFC, age, education, and work experience?

Under this five–step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only found disabled if she satisfies each element of the analysis, including inability to do other work, and meets the durational requirements. 20 C.F.R. §§ 404.1520(b)–(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff argues the ALJ: 1) erred by adopting the previous ALJ's RFC determination in light of new and material evidence; 2) improperly weighed opinion evidence; and 3) erred in his determination of Plaintiff's credibility. Each argument is addressed in turn.

### *RFC Finding and* <u>*Drummond*</u> *Analysis*

First, Plaintiff argues she suffers from impairments and resulting exertional and nonexertional limitations that were not present in her earlier disability application, and therefore, the ALJ erred by adopting the former ALJ's RFC determination. (Doc. 13, at 15-18). The Commissioner does not address this argument, which implicates the *Drummond* rule.

Under *Drummond*, prior decisions of the Commissioner which were not appealed are binding on a claimant and the Commissioner. *Drummond,* 126 F.3d at 841. The Sixth Circuit held the Commissioner is bound by its prior findings with regard to a claimant's RFC unless new

evidence or changed circumstances require a different finding. *Id.* SSA Ruling 98-4(6) therefore mandates:

> When adjudicating a subsequent disability claim with an adjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the adjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98-4(6), 1998 WL 283902, at *3.

It is Plaintiff's burden to show circumstances have changed since the prior ALJ's decision "by presenting new and material evidence of deterioration." *Drogowski v. Comm'r of Soc. Sec.*, 2011 WL 4502988, at *8 (E.D. Mich.) *report and recommendation adopted*, 2011 WL 4502955 (E.D. Mich.). New evidence is evidence that was "not in existence or available to the claimant at the time of the administrative proceeding that may have changed the outcome of the proceeding." *Coakley v. Comm'r of Soc. Sec.*, 2014 U.S. Dist. LEXIS 37448, at *55 (S.D. Ohio) (citing *Schmiedebusch v. Comm'r of Soc. Sec.*, 536 F. App'x 637, 647 (6th Cir. 2013)). Evidence is considered material if there is a reasonable probability that the Commissioner would have reached a different decision if he or she had considered the new evidence. *Coakley*, 2014 U.S. Dist. LEXIS 37448, at *55 (citing *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988)).

Here, Plaintiff claims her circumstances changed and in support directs the Court to evidence of bilateral carpal tunnel syndrome, fibromyalgia, and depression. (Doc. 13, at 15-18). Specifically, Plaintiff points to Dr. Brooks' June 2011 examination, which revealed positive Phalen's and Tinel's signs, painful range of motion in both wrists and shoulders, and 14 of 18 fibromyalgia tender points (Tr. 437-446, 474-76); x-rays which confirmed degenerative joint

disease in both hands (Tr. 443-46, 475); and Dr. Brooks' conclusion that physical findings were suggestive of bilateral carpal tunnel syndrome and fibromyalgia (Tr. 438, 475). Despite the fact that evidence of these impairments is enough to warrant an extremely close and careful review, the undersigned recommends the Court find the Commissioner's decision supported by substantial evidence because there is not a reasonable probability that the Commissioner would have reached a different decision in light of the new evidence.

In his decision, the ALJ carefully considered all relevant evidence. (Tr. 28-32). However, the ALJ concluded the records pertaining to fibromyalgia and carpal tunnel syndrome, "despite their volume, do not contain new and material evidence that justifies changing the analysis and conclusions of the previous ALJ". (Tr. 30). Similarly, after reviewing all of Plaintiff's mental health records, the ALJ determined there was not new and material evidence of a deteriorating mental health condition. (Tr. 32).

It is true the previous ALJ did not discuss fibromyalgia symptoms (Tr. 82-99). However, the ALJ in this case did not ignore symptoms of fibromyalgia; rather, he explicitly discussed the relevant evidence but found it less than credible considering the evidence of record. Indeed, the ALJ considered Plaintiff's subjective complaints of pain "all over" (Tr. 534), Dr. Brooks' finding of 14/18 fibromyalgia tender points in the classic distribution (Tr. 438, 535), and Dr. Brooks' treatment note questioning whether fibromyalgia was the sole cause of Plaintiff's joint symptoms or whether Plaintiff had underlying sarcoid arthropathy or early degenerative disease (Tr. 475). (Tr. 28-29).

The ALJ noted that Dr. Brooks advised Plaintiff to exercise daily, which was problematic when coupled with Plaintiff's extreme claims, including that she could not walk more than five steps and had pain all over her body. (Tr. 28, 30). Further, Plaintiff's therapist indicated that

casual observation of Plaintiff's movement revealed no pain or limitation. (Tr. 30). Moreover, the ALJ relied on the state agency medical consultants who made findings consistent with the RFC. (Tr. 30). Further, as explained below, the ALJ's adverse credibility determination is supported by substantial evidence. In short, the ALJ considered all evidence of record, including evidence from Plaintiff's treating physicians, and determined that the evidence did not demonstrate deterioration in condition despite a working fibromyalgia diagnosis.

Contrary to Plaintiff's claims, the ALJ did not violate Social Security Regulation (SSR) 12-2p, 2012 WL 3104869. This regulation directs an ALJ to look to a history of widespread pain, at least 11 tender points, and evidence that other causative effects were considered but excluded. However, Plaintiff has not pointed to evidence which opines on the functional severity of fibromyalgia nor excludes other possible causes of similar symptoms. Rather, Dr. Brooks expressly questioned the origin of Plaintiff's symptoms, suspecting degenerative joint disease, sarcoid arthropathy, or fibromyalgia (Tr. 438). (Tr. 29). Moreover, "[t]he mere diagnosis of fibromyalgia, coupled with allegations of disabling subjective limitations, does not, *ipso facto*, require an ultimate finding of disability." *Id.* As the Sixth Circuit has said, "a diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits . . . . Some people may have a severe case of fibromyalgia as to be totally disabled from working but most do not and the question is whether claimant is one of the minority." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) (citing *Rogers*, 486 F.3d 234; *Preston*, 854 F.2d 815).

Even though the previous ALJ did not mention fibromyalgia (nor did Plaintiff allege to suffer from fibromyalgia-like symptoms at that time), the ALJ's decision in this case is supported by substantial evidence because the evidence related to fibromyalgia does not create a reasonable probability that the ALJ would arrive at a different decision. (Tr. 90-92).

13

Similarly, although the previous ALJ did not discuss carpal tunnel syndrome, the current ALJ determined evidence of carpal tunnel was not new and material such that the ALJ would have "reached a different decision if he or she had considered the new evidence". *Coakley*, 2014 U.S. Dist. LEXIS 37448, at *55; (Tr. 90). Indeed, the ALJ explicitly discussed the relevant evidence but found it less than credible considering the evidence of record. The ALJ considered evidence including Plaintiff's complaints of pain in her hands and wrist (*see* Tr. 437, 529), physical examinations indicating painful range of motion in both wrists with a positive Phalen's and Tinel's at the wrists bilaterally (Tr. 438), x-rays showing trace degenerative joint disease in the first carpometacarpal joint bilaterally and a very slight spur formation in the first carpometacarpal joint bilaterally (Tr. 443-46, 475), Dr. Brooks' physical examination suggesting carpal tunnel syndrome at the wrists bilaterally (Tr. 438), normal EMG results (Tr. 524), Plaintiff's use of wrist splints at night (Tr. 60), and Dr. Strohl's attribution of some of Plaintiff's limitations to carpal tunnel syndrome (Tr. 520-21). (Tr. 29-31).

However, the ALJ discredited allegations of debilitating carpal tunnel syndrome in part because Dr. Strohl diagnosed carpal tunnel based solely on Plaintiff's subjective complaints and did not find a diagnosis in her record. (Tr. 31). In fact, it is not clear from the record whether Plaintiff was definitively diagnosed with carpal tunnel syndrome. Further, objective evidence indicates only mild findings, such as trace degenerative joint disease, a very slight spur formation, and normal EMG results. Additionally, Plaintiff admitted at the hearing the wrist splints helped. (Tr. 60). Despite the fact the previous ALJ did not consider symptoms of carpal tunnel syndrome, the ALJ's treatment of carpal tunnel syndrome does not require remand under *Drummond*. This is because the ALJ's determination that the evidence relating to Plaintiff's

carpal tunnel syndrome does not amount to a changed and deteriorated condition is supported by substantial evidence.

With regard to depression, the ALJ considered several generally unremarkable mental status examinations, allegations of depression due to disability denial/financial trouble and health problems, and two hospitalizations. (Tr. 31-32). However, the ALJ discounted this evidence because Plaintiff did not have side effects from her medication, said the medication was effective, never saw a counselor, and had generally normal mental status examinations. (Tr. 32). These findings are consistent with the previous ALJ's findings of less-than-debilitating effects of depression. To this end, the previous ALJ considered evidence of Plaintiff's generally normal mental status examinations, diagnosis of at most mild depression, and progress notes showing improvement. (Tr. 91). Therefore, the ALJ did not err in his treatment of Plaintiff's depression as there is not new and material evidence of a deteriorating condition.

After close and careful review, the undersigned finds the ALJ did not err under *Drummond* concerning her treatment of evidence of fibromyalgia, carpal tunnel syndrome, and depression. Although the addition of evidence related to fibromyalgia and carpal tunnel syndrome raises a valid *Drummond* argument, because the ALJ considered all relevant evidence of record and supported the RFC with substantial evidence, remand is not appropriate.

### Treating Physician Rule

Next, Plaintiff takes issue with the ALJ's decision to afford great weight to the opinions of four medical consultant reviewers despite the fact neither had the opportunity to review many of the records from treating physicians Drs. Brooks and Strohl or continuing mental health records. (Doc. 13, at 19, 21). Plaintiff also argues the ALJ failed to provide good reasons for the

weight assigned to Drs. Gould and Strohl. (Doc. 13, at 20-21). These arguments implicate the well-known treating physician rule.

An ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c); 416 C.F.R. § 927(c). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship—length, frequency, nature and extent; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict the opinion. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Even if the treating physician's opinion is not entitled to "controlling weight," there is nevertheless a rebuttable presumption that it deserves "great deference" from the ALJ. *Id.*

Importantly, the ALJ must give "good reasons" for the weight given a treating physician's opinion. *Id.* Failure to do so requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581

F.3d 399, 409–10 (6th Cir. 2009). An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely*, 581 F.3d at 409–10. Good reasons are required even when the ALJ's conclusion may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in cases where a claimant knows his physician has deemed her disabled and might be bewildered when told by an ALJ she is not, unless some reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The requirement also ensures the ALJ applied the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id*.

First, Plaintiff argues, without support, that the ALJ erred by affording weight to treatment providers who did not consider the entire record. (Doc. 13, at 19, 21). Again, the Commissioner did not respond to this argument. Despite this, the undersigned directs to Court to *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) and its progeny. *See also Hensley v. Astrue*, 573 F.3d 263, 266-67 (6th Cir. 2009).

In *Blakley*, the Sixth Circuit remanded in part because the ALJ improperly elevated the opinion of a non-examining source over that of a treating source even though the non-examining source had not reviewed the treating source's opinion. 581 F.3d at 409. The Court held, "because much of the over 300 pages of medical evidence reflects ongoing treatment and notes by Blakley's treating sources, 'we require some indication that the ALJ at least considered these facts before giving greater weight to an opinion that is not based on a review of a complete case record." *Id*. (quoting *Fisk v. Astrue*, 253 F. App'x 580, 585 (6th Cir. 2007)). However, "*Blakley* does not support remand in any case in which an ALJ has relied upon consultants who were unable to review a complete record." *Linkhart v. Comm'r of Soc. Sec.*, 2014 U.S. Dist. LEXIS

43500, at *25 (S.D. Ohio). The Sixth Circuit reversed, rather, because "the ALJ failed to indicate that he had 'at least considered [that] fact before giving greater weight'" to the consulting physician's opinions. *Id.* (quoting *Blakely*, 581 F.3d at 409). Generally, *Blakely* stands for the proposition that an ALJ must consider all relevant evidence and provide good reasons for the weight afforded to opinion evidence. *Curry v. Colvin*, 2013 WL 5774028, at *17, *19 (N.D. Ohio).

Here, concerning physical impairments, Plaintiff argues the state agency examiners did not consider "many of the records from treating physicians Dr. Brooks and Dr. Strohl." (Doc. 13, at 19). Ostensibly, Plaintiff refers to any records dated after September 29, 2011, when the state agency examiners last considered Plaintiff's RFC. (Tr. 125, 140). This means the state agency examiners did not consider at least the following: 1) December 8, 2011 treatment notes from Dr. Brooks documenting Plaintiff's reports of pain in her wrist and ordering an EMG (Tr. 529); 2) December 15, 2011 treatment notes from Dr. Strohl indicating Plaintiff was medically stable (Tr. 494); 3) February 28 treatment notes from Dr. Brooks indicating the EMG results were normal (Tr. 524); 4) a January 11, 2012 discharge summary from physical therapy indicating Plaintiff was doing better and failed to finalize her home exercise program (Tr. 536); 5) January 19, 2012 treatment notes from Dr. Strohl indicating Plaintiff was doing fairly well with an unremarkable physical examination and normal lung function during a six-minute walk (Tr. 544); and 6) a March 29, 2012 medical source statement completed by Dr. Strohl (Tr. 520).

Regarding mental impairments, the state agency examiners would not have considered evidence after May 25, 2011 (Tr. 101, 112), which includes at least: 1) a September 12, 2011 mental status examination which was generally unremarkable aside from depression (Tr. 506); 2) December 28, 2011 treatment notes from Dr. Gould indicating worsening mood, suicidal

ideation, and Plaintiff being "pink slipped" to the hospital (Tr. 504-05); 3) hospital records from December 28, 2011 through December 30, 2011 (Tr. 495); and 4) a January 6, 2012 mental status examination (Tr. 502).

In his decision, the ALJ considered all relevant evidence then found the state agency opinions supported the RFC. (Tr. 32). By expressly considering all evidence, including evidence submitted after the state agency consultant's opined on Plaintiff's case, he did not err under *Blakely*. Although the ALJ could have been more explicit, he found the evidence produced after the consultants issued their opinions did not change the underlying RFC in his *Drummond* determination. In sum, because the ALJ considered all evidence of record and provided good reasons for discounting the opinions of Drs. Gould and Strohl, as explained below, and where Plaintiff did not direct the Court to any legal analysis for her argument, the undersigned finds the ALJ did not err by affording the state agency examiners great weight under *Blakely*.

Next, Plaintiff argues the ALJ did not provide good reasons for affording Dr. Strohl's December 14, 2011 and March 29, 2012 opinions less than controlling weight. (Doc. 13, at 20; Tr. 491-94, 520-21). The ALJ rejected the assessments to the extent they differed from the RFC finding because Dr. Strohl said Plaintiff was "stable from a medical point of view" (Tr. 494) and Dr. Strohl attributed some of Plaintiff's limitations to carpal tunnel syndrome, even though there was no diagnosis of such in Plaintiff's record. (Tr. 31). Further, the ALJ noted Plaintiff's 6-minute walk was within normal limits (Tr. 544) and determined Dr. Strohl's opinion was based on Plaintiff's subjective complaints rather than his professional opinion. (Tr. 31). Thus, the ALJ challenged the opinions' supportability and consistency with the record as a whole.

Plaintiff also argues the ALJ did not provide good reasons for affording Dr. Gould's March 30, 2011 medical source statement little weight. (Tr. 32). The ALJ noted that Dr. Gould

found Plaintiff's ability was poor in 12 of 21 activities but gave the opinion little weight because "it was not supported by the mental status examinations or the record as a whole", and by citation directs the reader to a treatment note. (Tr. 498). In that treatment note, Dr. Gould indicated Plaintiff was depressed because she was denied disability and expressed doubt that Plaintiff would ever get disability, despite Plaintiff's insistence on appealing. (Tr. 498). Further, as summarized by the ALJ, Plaintiff routinely had generally normal mental status examinations. Thus, the ALJ challenged the opinion's consistency with the record as a whole.

Although the ALJ's reasons for discounting the opinions of Drs. Strohl and Gould were brief, they were sufficient. *Allen*, 561 F.3d at 651. After thoroughly explaining the record, the ALJ acknowledged the opinions, gave good reasons for affording the opinions less than controlling weight, and supported his decision with specific reference to record evidence. The ALJ therefore followed the treating physician and good reasons rules, and his decision to afford the opinions of Drs. Strohl and Gould less than controlling weight is supported by substantial evidence. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011) (noting the "good reasons" rule does not require an "exhaustive factor-by-factor analysis").

***Credibility***

Next, Plaintiff objects to the ALJ's adverse credibility determination. (Doc. 13, at 21). The Sixth Circuit recognizes that pain alone may be disabling. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). However, an ALJ is not required to accept a claimant's own testimony regarding his pain. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 404.1529; *see also* Social Security Ruling (SSR) 96-7p, 1996 WL 374186. For pain or other subjective complaints to be considered disabling, there must be: 1) objective medical evidence of

an underlying medical condition; and 2) objective medical evidence that confirms the severity of the alleged disabling pain, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994). This standard does not require "objective evidence of the pain itself." *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

A plaintiff's failure to meet the above-stated standard does not necessarily end the inquiry. Rather, "in the absence of objective medical evidence sufficient to support a finding of disability, the claimant's statements about the severity of his or her symptoms will be considered with other relevant evidence in deciding disability." *Swain v. Comm. of Soc. Sec.*, 297 F. Supp. 2d 986, 989 (N.D. Ohio 2003) (citing SSR 96-7p).

The ALJ is to consider certain factors in determining whether a claimant has disabling pain: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication to relieve pain; and 6) any measures used to relieve pain. 20 C.F.R. 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See Bowman v. Chater*, 1997 WL 764419, at *4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, at *13 (N.D. Ohio).

Further, an "ALJ is not required to accept a claimant's subjective complaints" and may "consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476. An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of*

21

*Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("we accord great deference to [the ALJ's] credibility determination.").

Here, the ALJ acknowledged he must consider pain under SSR 96-7p and 20 C.F.R. § 404.1529. (Tr. 27). Although the ALJ determined Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, he found Plaintiff's "statements concerning the intensity, persistence and limiting effect of these symptoms [we]re not credible to the extent they were inconsistent with the . . . [RFC] assessment." (Tr. 28). Specifically, the ALJ found the following did not support Plaintiff's allegations of debilitating pain:

> Dr. Brooks regularly advised [Plaintiff] to exercise daily. Certainly if [Plaintiff's] allegations were true, Dr. Brooks would not simply advise [Plaintiff] to exercise daily. On June 30, 2011, [Plaintiff] told the physical therapist that she "does nothing" but the physical therapist noted that by casual observation of [Plaintiff's] movement, it did not reveal evidence of pain or limitation.

(Tr. 30) (internal citations omitted). Further, regarding mental impairments, the ALJ found no evidence of counseling and deduced Plaintiff's symptoms were not as severe as alleged. (Tr. 32). The ALJ determined the evidence did not show Plaintiff's use of prescription medication was accompanied by side effects that would interfere significantly with her ability to perform a range of light work. (Tr. 32). Regarding daily activities, the ALJ found Plaintiff had a mild restriction, noting she attended to personal care, her adult daughters did cleaning and shopping, and Plaintiff was able to drive and manage finances. (Tr. 26). Of note, at the hearing, Plaintiff said her daughters helped her dress, shower, and wash her hair. (Tr. 56). Having reviewed the record, the undersigned finds the ALJ's pain and credibility determination is supported by substantial evidence.

To this end, the ALJ considered Plaintiff's daily activities, and determined they were mildly restricted. (Tr. 26). The ALJ also considered the effectiveness and lack of significant side effects from prescription medication, Plaintiff's treatment history – including a lack of counseling, and measures to relieve pain, including a recommendation for exercise, physical therapy treatment, and prescription medication. (Tr. 30, 32).

Plaintiff takes issue with the ALJ's reliance on a March 2011 treatment note, which reads, "[s]tarted counseling [and] feels it will be beneficial." (Tr. 463). Plaintiff testified she saw a counselor when she went to the psychiatrist and was compliant with treatment. (Doc. 13, at 23-24; Tr. 62). However, neither the ALJ nor the undersigned are able to make out evidence of definitive counseling treatment, nor has Plaintiff directed the Court to such evidence. In short, Plaintiff's allegations of totally debilitating pain are simply not supported by objective findings. Therefore, and in light of the high level of deference afforded to an ALJ's credibility determination, the undersigned finds the ALJ's credibility determination is supported by substantial evidence. *Ritchie v. Comm'r of Soc. Sec.*, 2013 U.S. App. LEXIS 20572, at *7, 2013 WL 5496007 (6th Cir. 2013) (an ALJ's credibility findings are "virtually unchallengeable") (quoting *Payne v. Comm'r of Soc. Sec.*, 2010 WL 4810212, at *3 (6th Cir. 2010)).

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying DIB and SSI benefits applied the correct legal standards and is supported by substantial evidence. Accordingly, the undersigned recommends the decision of the Commissioner be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).